# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **A3 Artists Agency, LLC,** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **No.  1:23-cv-00715-DII** |
| | § | |
| **Night Media, Inc. & Ezra** | § | |
| **Cooperstein** | § | |
| *Defendant* | | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:   HONORABLE UNITED STATES DISTRICT JUDGE

Before the Court is Defendants' Motion to Dismiss, Dkt. 11, and all related briefing. After reviewing these filings and the relevant case law, the undersigned recommends that the Court grant Defendants' motion.

## I.      BACKGROUND

This is a tortious interference with contracts case. Plaintiff A3 Artists Agency ("A3") is a talent agency and citizen of the states of New York and California; Defendant Night Media ("Night") is a management firm and Delaware corporation with its principal place of business in Austin, Texas; and Defendant Ezra Cooperstein is Night's president and a resident of Texas. Dkt. 1, at 1. A3 alleges that Night and Cooperstein tortiously interfered with A3's contracts because they caused "artists and talent agents contracted to A3 to terminate their relationship with A3." *Id.* at 4. Additionally, A3 alleges that Night operates as an unlicensed talent agency and does not comply with the regulations of California's Talent Agency Act (the "TAA") giving

1

it an unlawful competitive advantage in terms of its profitability and the compensation it is able to offer agents as compared to A3, a licensed talent agency. *Id.*

A3's claims stem from the departure of talent agent Adam Loria and at least one A3 artist-client from A3 to Night. *Id.* at 5. At the time, Loria was under a binding Employment Agreement with A3 which gave A3 the option to employ Loria through November 2024. *Id.* In 2023, Cooperstein and Night solicited Loria to leave A3 and join Night, allegedly with knowledge of the binding A3 Employment Agreement. *Id.* Loria later made allegedly unfounded work-environment allegations against A3. *Id.* Loria then claimed he'd been constructively discharged from A3 and ceased reporting to work, even though A3 had not terminated him, and he had not attempted to resign. *Id.* A3 continued to employ Loria, placed him on disability leave, and paid his salary. *Id.*

Cooperstein then contacted A3 about hiring Loria and offered to not pursue any other A3 employees in exchange for A3 releasing Loria from his Employment Agreement. *Id.* at 6. A3 declined the offer. *Id.* One month later Loria attempted to resign from A3 and began holding himself out as working at Night even as he met with A3 clients over Zoom. *Id.* Loria now works as Vice President at Night in breach of his Employment Agreement with A3. *Id.* A3 argues that, based on these facts, Night and Cooperstein willfully interfered with Loria's Employment Agreement and caused him to breach the Agreement. *Id.* at 6. A3 believes Defendants have attempted to induce at least one other employee to leave A3. *Id.*

A3 further alleges that Defendants also wanted Loria to induce A3 clients to breach their contracts and follow him to Night. *Id.* A3 claims Defendants have been successful in at least one instance in this regard because a now-former A3 client has informed A3 that they are leaving A3 to work with Night. *Id.* This client had a contract with A3 that was breached as a result of Defendants' inducing the client to join Night. *Id.* In addition to lost revenues from at least one client, A3 claims it has also suffered injury to its goodwill resulting from Loria's allegedly false workplace allegations about A3. *Id.* at 7.

A3 brings three causes of action for: (1) unfair competition under the California Unfair Competition Law ("UCL") related to Night's carrying on as an unlicensed talent agency; (2) tortious interference with Loria's existing contract with A3; and (3) tortious interference with existing client contracts. *Id.* at 8-10. Defendants move to dismiss A3's claims, arguing: (1) A3 fails to plead facts demonstrating that it has overcome the presumption against extraterritorial application of the UCL; and (2) even if such facts were pleaded, A3 is required to adjudicate its claims with the California Labor Commissioner and has failed to demonstrate that it has exhausted administrative procedures as a precondition to filing suit. Dkt. 9, at 2-3.

A3 responds that the tortious interference claims are independent of any claims for violation of the TAA pursuant to the UCL and that the presumption against extraterritorial application of the UCL does not apply here, where A3 has pleaded conduct that occurred at least in part in California. Dkt. 11, at 1-2.

## II.        LEGAL STANDARD

### A.        12(b)(6)

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and

matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

## III.    DISCUSSION

### A.    Unfair Competition Claim

A3 asserts a claim against Night under Section 17200 of the California UCL based on alleged violations of the California TAA.  Dkt. 1, at 4. A3 claims that Night has violated the TAA by operating as an unlicensed talent agency and holding itself out as being capable of and actually performing work as a talent agency. *Id.* Defendants move to dismiss this claim arguing that A3 has failed to plead facts showing that California's UCL should apply against Night outside of California. Dkt. 9, at 4.

California maintains a presumption against the extraterritorial application of its statutes. *Sullivan v. Oracle Corp.*, 254 P.3d 237, 248 (2011). "However far the Legislature's power may theoretically extend, [California courts] presume the

Legislature did not intend a statute to be operative, with respect to occurrences outside the state, unless such intention is clearly expressed or reasonably to be inferred from the language of the statute or from its purpose, subject matter or history." *Id.* (citations omitted) (cleaned up).   The presumption against the extraterritorial application of California's statutes "applies to the UCL in full force," because "[n]either the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially." *Id.* (citations omitted).

However, the presumption may be overcome when a plaintiff pleads facts demonstrating that a non-resident's misconduct took place in California. *See Kearney v. Hyundai Motor Co.*, No. SACV 09-1298 DOC, 2010 WL 9093204, at *8 (C.D. Cal. June 4, 2010) ("[A] plaintiff may not assert an unfair competition claim against [a] corporation where the activities giving rise to the claim occurred outside California.") (internal citations omitted); *Jack in the Box Inc. v. San-Tex Restaurants, Inc.,* No. SA-20-CV-00328-XR, 2021 WL 148058, at *6 (W.D. Tex. Jan. 14, 2021) ("The California Supreme Court has interpreted [the UCL] to reach non-residents where the allegedly fraudulent conduct occurs in California.").

A3 argues that it has "alleged facts that Defendants' wrongful conduct plausibly occurred in California." Dkt. 11, at 3. Turning to the complaint, A3 pleads that Defendants are citizens of Texas and have their principal place of business in Austin and that A3 is a citizen of and located in California. Dkt. 1, at 1. A3 states that its business is conducted primarily through its talent agents but does not state

where those agents are generally located. *Id.* at 3. As to Defendants' specific conduct, A3 claims Defendants "courted," "solicited," and "contacted" A3's employees in order to lure them away from A3. *Id.* at 5.

A3 argues that it "does not allege that the unlawful conduct by Defendants occurred entirely outside of the state of California," yet acknowledges that it "does not explicitly allege that the complained of conduct occurred, at least in part, in California." Dkt. 11, at 5. Still, A3 states, "the Court is empowered to make reasonable inferences using experience and common sense." *Id.* To that end, A3 contends that because it has pleaded that it is a "California citizen and talent agency located in California" and alleged that Defendants "are unlawfully and unfairly competing with A3's business in California" by luring away its agents and clients away, it reasonably follows that A3 has pleaded that Defendants acted in California. *Id.* at 6 (citing Dkt. 1, at 3,7). The undersigned disagrees with this proposed leap. *See*, *e.g.*, *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 359 (5th Cir. 2017) ("An inference is not reasonable if premised on mere suspicion—some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.").

Here, the inference that Defendants' conduct took place in California is premised on speculation that in order to compete with A3's business and interfere with A3's contracts by hiring away employees or taking clients, Defendants (who are based in Austin) must have acted in California to some extent. However, there is nothing in the pleadings, besides the fact that A3 is based in California, to support

this proposed inference. *Compare*, *e.g.*, *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1097 (C.D. Cal. 2015) ("Because Warner does not adequately allege whether decisions concerning Tinder's business practices and advertising emanated from California, and does not plead facts demonstrating that this is so, his UCL claim fails."); *Gustafson v. BAC Home Loans Servicing*, LP, No. SACV 11-915-JST, 2012 WL 4761733, at *6 (C.D. Cal. Apr. 12, 2012) (concluding that the even where plaintiff pleaded defendants' scheme was devised, implemented, and directed from defendants' offices in California, plaintiffs could not  sustain a claim under the California UCL); *Gross v. Symantec Corp.*, No. CV 12-00154 CRB, 2012 WL 3116158, at *7 (N.D. Cal. July 31, 2012) (finding, where the plaintiff alleged defendant was headquartered in California, "several courts have found that this allegation is not enough to create a plausible inference that the unlawful conduct emanated from that location").

The undersigned finds that A3 has not pleaded facts regarding acts or omissions that occurred in California. At most, it has alleged that it was injured in California, but A3 has not brought forth any persuasive arguments or case law demonstrating that this is sufficient to overcome California's presumption against extraterritorial application of its statutes such that a California resident may bring suit under the UCL against a non-resident in Texas.

Accordingly, A3's claims under the UCL should be dismissed without prejudice. To the extent A3 wishes to amend its complaint, A3 is advised it must move for leave to do so pursuant to Local Rules CV-15(b) and CV-7(b) governing amended pleadings,

which state that that "[w]hen a motion for leave to file a pleading, motion, or other submission is required, an executed copy of the proposed pleading, motion, or other submission shall be filed as an exhibit to the motion for leave." W.D. Tex. Loc. R. CV-15(b); *id.* CV-7(b).

### B.   Tortious Interference Claims

Defendants move to dismiss A3's tortious interference claim, arguing that A3 has failed to exhaust their administrative remedies. Dkts. 9, at 7; 12, at 5. Specifically, Defendants contend that A3's tortious interference claims are "predicated on purported violations of the TAA" and, thus, colorably arise under the TAA, making the claims subject to the exclusive jurisdiction of the California Labor Commissioner. Dkt. 12, at 5. The threshold question is whether A3 has pleaded its tortious interference claims independently of the statutory violations alleged under the TAA or whether the tortious interference claims, in fact, arise under the TAA.

### 1.   A3's tortious interference pleadings

As to its tortious interference claims, A3 pleads:

In November 2019, A3 entered into an Employment Agreement with talent agent Adam Loria ("Loria"). The initial term of Loria's Employment Agreement was one year, with A3 having four dependent unilateral options to renew Loria's services for additional one-year terms. In other words, Loria agreed that A3 would have the option to employ him through November 2024.

After having moved through the ranks and after receiving training as an agent and a substantial pay increase from A3, Loria was courted by Cooperstein and Night, with Cooperstein personally soliciting Loria to leave A3 and join Night.  On information and belief, Night knew that Loria was bound by an employment agreement with A3.  Indeed, this was not an isolated incident as Cooperstein and Night made similar solicitations of at least one employee at A3's sister entity.

On April 13, 2023, despite his contractual obligations, Loria, through his lawyer, surprised A3 by asserting a concocted claim that Loria had been constructively discharged and he would no longer report to work. A3, in fact, had not terminated Loria. Loria had not attempted to resign his employment. … In any event, Loria remains under contract with A3 pursuant to his Employment Agreement, with A3 having the option to continue that relationship through November 2024.

While Loria was on his paid leave from A3, on May 17, 2023, Night's president, Ezra Cooperstein, contacted A3 in an attempt to hire Loria away from A3. Cooperstein offered not to raid any other A3 employees in exchange for A3 resolving the Loria situation in a way that would allow Loria to work for Night. Despite Cooperstein's overtures, A3 declined to terminate Loria's Employment Agreement. On the evening of June 12, 2023, again in contravention of his Employment Agreement with A3, Loria, through counsel, purported to resign from A3. In the morning of June 14, 2023, Loria appeared on a Zoom conference with a client of A3. However, Loria represented that he was now working for Night. According to his LinkedIn profile, Loria is now the Vice President of Digital at Night Media.

Thus Night and Cooperstein willfully and intentionally interfered with Loria's contract with A3 and caused Loria to breach that contract. It appears that Cooperstein implemented this same playbook with at least one other A3 agent and A3 is still investigating that effort and any other efforts by Night and Cooperstein to interfere with the existing contracts of A3's agents.

But Night and Cooperstein's endgame was not simply to hire Loria (and other agents) away from A3—Night and Cooperstein wanted Loria to cause A3 clients to breach their contracts and follow Loria to Night. This became obvious when the assistant of a now former A3 client ("Client 1") called A3 to inform the agency that Client 1 was leaving A3 to work with Night. Client 1 had a contract with A3 to act as Client 1's talent agency. But Night and Cooperstein's actions caused Client 1 to breach a contract with A3, causing A3 to lose the revenue it otherwise would have gained as a percentage of Client 1's earnings. That revenue now goes to Night.

In addition to lost revenue from at least one client leaving for Night, A3 has suffered, and will continue to suffer, injury to its goodwill resulting from what appears to be Night In addition to lost revenue from at least one client leaving for Night, A3 has suffered, and will continue to suffer, injury to its goodwill resulting from what appears to be Night and

Cooperstein's direction for Loria to make false allegations regarding A3's work environment.

Night and Cooperstein intentionally interfered with Loria's Employment Agreement and caused Loria to breach that agreement. Night and Cooperstein also intentionally interfered with A3's contract with at least one of its artists, causing the artist to breach his or her contract.

Dkt. 1, at 4-7.

2.      Whether A3's tortious interference claims arise under the TAA

The TAA specifies that "[i]n cases of controversy arising under this chapter, the parties involved shall refer the matters in dispute to the Labor Commissioner, who shall hear and determine the same, subject to an appeal ... to the superior court where the same shall be heard de novo." Cal. Lab. Code § 1700.44(a) ("The Commissioner has the authority to hear and determine various disputes, including the validity of artists' manager-artist contracts and the liability of the parties thereunder."); *Buchwald v. Superior Ct. In & For City & Cnty. of San Francisco*, 62 Cal. Rptr. 364, 371 (Ct. App. 1967). Disputes must be heard by the Commissioner, and all remedies before the Commissioner must be exhausted before the parties can proceed to the California superior court. *REO Broadcasting Consultants v. Martin*, 69 Cal. App. 4th 489, 494-95 (Cal. Ct. App. 1999).

California courts have indicated "that all claims or defenses which *colorably* arise under the [TAA] must be submitted to the Commissioner before consideration by the superior court, because the Commissioner has exclusive original jurisdiction not only to decide the merits of a controversy arising under the Act but also to determine, in the first instance, whether the dispute actually falls within this

11

statutory grant of authority." *Styne v. Stevens*, 26 P.3d 343, 355 n.10 (2001).  The

term "colorable" in this context is used "in its broadest sense." *Id.* While a court need

"not refer to the Commissioner a case which, despite a party's contrary claim, clearly

has *nothing to do* with the Act … [f]or example, an automobile collision suit between

persons unconnected to the entertainment industry… if a dispute in which the Act is

invoked plausibly pertains to the subject matter of the Act, the dispute should be

submitted to the Commissioner for first resolution of both jurisdictional and merits

issues, as appropriate." *Id.* Thus, the question here is whether A3's tortious

interference claims invoke the Act and plausibly pertain to the subject matter of the

Act.

      A3 argues that because its tortious interference claims involve a dispute

between a California talent agency and an out-of-state management company, the

claims are not within the purview of the TAA. Dkt. 11, at 9. Indeed, the TAA regulates

the activities of a "talent agency," i.e., "a person or corporation who engages in the

occupation of procuring, offering, promising, or attempting to procure employment or

engagements for an artist or artists …." Cal. Lab. Code § 1700.4(a). Further, the Act

is remedial; its purpose is to protect artists seeking professional employment from

the abuses of talent agencies. *Waisbren v. Peppercorn Productions, Inc.*, 48 Cal. Rptr.

2d 437, 441 (Cal. Ct. App. 1995).

      While it is true that the bulk of A3's tortious interference pleadings involve

Night's alleged interference with A3's contracts with a talent agent and a talent

agency client, the pleadings directly reference the TAA. The tortious interference

claim section of the complaint states: (1) that Loria and at least one A3 artist joined Night "likely due, at least in part, to Night falsely holding itself as providing talent agent providing talent agency services it is not licensed to provide [under the TAA]," and (2) Night's violations of the TAA make it a "more attractive option for talent interested in  paying a reduced fee to a one-stop management and talent agency shop." Dkt. 1, at 7.  Further, the pleadings implicate a relationship between an artist (the former A3 client) and Night, an allegedly unlicensed talent agency. In such cases, courts have found that the Commissioner has exclusive jurisdiction. *See Buchwald v. Superior Ct. In & For City & Cnty. of San Francisco,* 62 Cal. Rptr. 364, 370-373 (Ct. App. 1967) (where facts permitted inference that parties' relationship involved unlicensed talent agency services, Commissioner had exclusive jurisdiction to determine his jurisdiction over the dispute, first ascertaining whether plaintiff had in fact acted as talent agency by securing employment and bookings).

The undersigned finds that A3's pleadings invoke the TAA and plausibly pertain to the TAA. Thus, the tortious interference claims colorably arise under the TAA, and A3 must submit its dispute to the California Labor Commissioner before resolution by this Court, if for no other reason than for the Commissioner to determine, in the first instance, whether he or she has jurisdiction over the claims. *Blanks v. Seyfarth Shaw LLP*, 89 Cal. Rptr. 3d 710, 732 (Cal. Ct. App. 2009) (stating the TAA's "statutory scheme creates an absolute bar to plaintiffs who wish to circumvent the pre-suit requirement of filing first with the Commissioner"). A3's tortious interference claims should therefore be dismissed without prejudice.

## IV.    RECOMMENDATION

In accordance with the foregoing discussion, the undersigned **RECOMMENDS** that the District Court **GRANT** Defendants' Motion, Dkt. 9. A3's claims should be dismissied without prejudice. The referral of this matter should be **CANCELED.**

## V.    WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The district court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).  A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen days after the party is served with a copy of the Report shall bar that party from *de novo* review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED January 29, 2024.


_____
DUSTIN M. HOWELL
UNITED STATES MAGISTRATE JUDGE